Mohamed Abdul Hafiz EL TABECH, Plaintiff,

v.

Frank GUNTER, et al., Defendants.

Victor LUNA, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Reginald PIERCE, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Jerry JENSEN, et al., Plaintiffs,

v.

Frank GUNTER, et al., Defendants.

Nos. CV87–L–377, CV87–L–476, CV87–L–497, and CV87–L–607.

United States District Court, D. Nebraska.

March 28, 1996.

Gregory D. Barton, Harding, Shultz & Downs, Lincoln, NE, Robert W. Shively, Jr., DeMars, Gordon, Olson, Recknor & Shively, Lincoln, NE, Barry L. Hemmerling, Jeffrey, Hahn & Hemmerling, Lincoln, NE, Scott D. Freese, Hutton & Freese, Norfolk, NE, for plaintiffs.

Don Stenberg, Attorney General, Terri M. Weeks, Assistant Attorney General, Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before me upon remand from the United States Court of Appeals for the Eighth Circuit. *Jensen v. Clarke*, 73 F.3d 808 (8th Cir.1996) (*Jensen IV*). I have been directed to certify findings to the court of appeals. *Id.* at 811.

Because I presume both an understanding of the long history of this matter[1] and an appreciation of the need for its expeditious resolution, I shall respond to the remand order as simply and rapidly[2] as possible.

## I. DISCUSSION

Imagine you committed a crime and are entering the Nebraska State Penitentiary for the first time as a convicted felon. You are locked in a cell no bigger than a closet for 10 to 14 hours each and every day.

---

[1] This matter began in 1987 with the filing of four cases that were later consolidated. The case was originally assigned to United States District Judge Warren K. Urbom. An 18-day trial on liability took place before United States Magistrate Judge David L. Piester during the summer of 1991. Judge Piester filed his report and recommendation on June 11, 1992, and United States District Judge William G. Cambridge, to whom the case was then assigned, adopted Judge Piester's report and recommendation on September 9, 1992. *Jensen v. Gunter*, 807 F.Supp. 1463 (D.Neb.1992) (*Jensen I*). The defendants filed a defective appeal that was dismissed for lack of jurisdiction on April 30, 1993. *El-Tabech v. Gunter*, 992 F.2d 183 (8th Cir.1993) (*Jensen II*). On August 9, 1993, I granted a preliminary injunction and directed the defendants to submit a proposed remedial plan. The case was then permanently assigned to me. A remedial plan was filed, and I referred it to Judge Piester for a report and recommendation. Judge Piester submitted his report and recom- mendation to me in May, 1994, and various matters related to the report and recommendation, the remedial plan, a motion to reconsider the issue of liability, and the applicability of *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), were subsequently considered. A permanent injunction was imposed, and attorney fees were awarded on December 1, 1994. *El-Tabech v. Gunter*, 869 F.Supp. 1446 (D.Neb.1994) (*Jensen III*).

[2] The court of appeals remanded this case in an opinion dated January 11, 1996. I conferred with the parties on January 25, 1996. At the request of the parties, they were permitted to submit simultaneous briefs on the question raised by the remand on February 16, 1996, and reply briefs on February 28, 1996. None of the parties requested an opportunity to present additional evidence. The remand thus became ripe for decision on February 29, 1996.

In the cell you find a monster in the form of a man. The lights go down. It's hard to see in. If you scream, you probably will not be heard. Imagine further that this creature has a well-documented history of taking his recreation by sodomizing any available prey. If the prey resists, the monster may use a razor to slice the victim from the "shoulder down to the ass."

Imagine also that your keepers, who are by no means evil, know they can save you from brutalization by glancing at a few bits of paper. But your keepers have consciously decided that efficiently packing the available cells is more important than looking at the papers that might reasonably provide for your safety. Space is valuable, and you, as a prisoner, are not.

Imagine this scene (or some no less troubling variation) being repeated over and over again every year. As you digest the dry discourse that follows, it is useful to keep the monster in mind.

Relying upon *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the court of appeals has directed me to specifically "find whether the defendants actually knew of and disregarded a substantial risk to the safety of the plaintiffs." *Jensen IV,* 73 F.3d at 811.[3] The court was specifically concerned with "the subjective-state-of-mind component of deliberate indifference described in *Farmer.*" *Id.* The *Jensen IV* court expressly reserved judgment on

whether the plaintiffs were exposed to a substantial risk of physical harm. *Id.* at 810. Thus, the *Jensen IV* remand order was limited to the question of whether the defendants were "subjectively aware of a substantial risk of harm to the plaintiffs." *Id.* at 811.

In order to put the remand order in proper context, one must understand this court's prior ruling in favor of the plaintiffs. Among other things, the court previously ruled that: (1) a pervasive risk of harm from violence existed at the Nebraska penitentiary that carried over into the double cells of the housing units, and (2) the random placement of newly arrived inmates into double cells (without consideration of information regarding compatibility gathered and compiled during the initial intake of inmates) was not a reasonable response to the pervasive risk of harm. *Jensen I,* 807 F.Supp. at 1483.

Reading the general language of *Jensen IV* together with the specific holding of *Jensen I,* I understand the specific question on remand to be this:

Given that the "level of violence in the four main housing units exceeds what can be characterized as an unavoidable level ... [and that such] violence has carried over into the double cells," *Jensen I,* 807 F.Supp. at 1483, whether the "defendants[4] actually knew of and disregarded [the] substantial risk [from violence] to the safety of the plaintiffs," *Jensen IV,* 73 F.3d at 811, by "failing to use the classification

3. In July, 1994, I called to the attention of the parties the June, 1994, opinion of the United States Supreme Court in *Farmer v. Brennan.* (No. CV87–L–377, Filing 241.) (Unless otherwise indicated, all filing numbers refer to case No. CV87–L–377.) I directed that "all parties shall submit ... simultaneous briefs addressing the following question: In light of *Farmer v. Brennan* ... should this court, on this record, issue injunctive relief." (*Id.*) I also informed the parties that any "party desiring an evidentiary hearing shall file a request for such evidentiary hearing by August 5, 1994, or else it shall be assumed that the record before the court is adequate." (*Id.*) No one requested an evidentiary hearing. When I entered the judgment for injunctive relief, I was fully aware of *Farmer* and believed I had complied with it. Moreover, after this case was remanded, I specifically inquired of the parties once again about the need for more

evidence, but no one asked to present any. (Filing 280.)

4. For purposes of the remand, the parties have limited their arguments to defendants Harold W. Clarke (Clarke) and Frank X. Hopkins (Hopkins). These men were the only persons specifically named in the judgment and the injunction. *Jensen III,* 869 F.Supp. at 1471–74. As primary policy makers, Clarke and Hopkins were responsible for the double-celling policy challenged by the plaintiffs. The other primary policy maker in this regard, Frank Gunter, the previous director of the Department of Correctional Services (DCS), had left the employ of the State of Nebraska at the time of trial. The other defendants were subordinates of Clarke and Hopkins, and they simply implemented the policy of their supervisors. When the *Jensen IV* court uses the word "defendants," I understand the court to refer to Clarke and Hopkins. Accordingly, the discussion in the text focuses upon them.

information available to them in placing newly arriving inmates in double cells." *Jensen I,* 807 F.Supp. at 1483.[5]

In order to answer this question, it is helpful to first answer the following seven questions:

1.  Are inmates, including newly arrived inmates, frequently double-celled?

2.  Are newly arrived inmates randomly double-celled; that is, are newly arrived inmates assigned cells without consideration of classification information that could easily be used to predict inmate compatibility?

3.  Did Clarke and Hopkins actually know that newly arrived inmates were frequently randomly double-celled?

4.  Did the level of violence at the penitentiary, including violence in the double cells, pose a substantial risk of serious harm to the plaintiffs?

5.  Did Clarke and Hopkins actually know the level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs?

6.  Was the failure to use the classification information and the concomitant failure to determine inmate compatibility an unreasonable response to the substantial risk of serious harm to the plaintiffs?

7.  Are Clarke and Hopkins personally responsible for the failure to use classification information and the concomitant failure to determine inmate compatibility during the placement of newly arrived inmates in double cells?

I find as fact and conclude as law that the answer to each of these questions is "yes." Accordingly, both as a matter of fact and as a matter of law, I find and conclude that the plaintiffs have proved that Clarke and Hopkins "actually knew of and disregarded [the] substantial risk to the safety of the plain-

tiffs," *Jensen IV,* 73 F.3d at 811, by "failing to use the classification information available to them in placing newly arriving inmates in double cells." *Jensen I,* 807 F.Supp. at 1483.

The reasons for my findings and conclusions are set forth hereafter.

## A.  MOST INMATES ARE DOUBLE–CELLED.

■ Placing two inmates in a cell designed for one person was the norm and had been since at least 1981. *Jensen I,* 807 F.Supp. at 1467–1469 (especially Ex. 321). This court previously found that in the housing units, which normally contain 80 single cells, 60 of those single cells housed two inmates. *Id.* This means that 75 percent of the cells designed for one man held two instead. Indeed, by 1991 all the housing units at the penitentiary were, on average, 64 percent over design capacity. *Id.* at 1468 n. 4. A long waiting list for single cells required inmates to wait years before they were placed in single cells because such cells were assigned on the basis of "seniority." *Id.* at 1469 (Vol. I, at 48:1–4; Vol. II, at 176:14–21; Vol. III, at 458:24–459:1).

Clarke summarized the situation well when he described the housing units as "bursting at their seams." *Id.* at 1468 (Vol. VIII, at 1406:1–3). Teresa Mulkey, a housing unit manager who also chaired the "initial classification" meeting, testified that virtually all newly arrived inmates are double-celled.

Q.  And are all the people coming [from] the Diagnostic and Evaluation Center placed into a two-man cell?

A.  I would say most of them are.

Q.  Do any of them ever come in from D & E and go right to a single-man cell?

A.  The only possibility for that might be a handicapped inmate ... [or] someone going immediately to death row.... Oth-

---

5.  To the extent that the remand directs me to specifically apply *Farmer* to those issues on which the plaintiffs were unsuccessful at the trial stage, it is clear, and I so find, that the plaintiffs would not have prevailed on those issues if the *Farmer* standard had been explicitly applied. However, I do not understand the remand to apply to the plaintiffs' unsuccessful claims, and I note that the parties have so limited their arguments on remand.

erwise, no, they would go to a two-man cell.

(Vol. VII, at 1202:10–21.)

## B. NEW INMATES ARE OFTEN RANDOMLY ASSIGNED TO A DOUBLE CELL; THAT IS, THEY ARE ASSIGNED TO A CELL WITHOUT CONSIDERATION OF CLASSIFICATION INFORMATION THAT COULD EASILY BE USED TO PREDICT INMATE COMPATIBILITY.

I shall first reexamine the findings of Judges Piester and Cambridge regarding the question of random cell assignments. I shall then examine the response of Clarke and Hopkins.

### 1.

Judge Piester and Judge Cambridge found that the procedure for assigning newly arrived inmates to double cells was "random." *Id.* at 1477. While there was some divergence of testimony on this issue, I agree with Judges Piester and Cambridge that newly arrived inmates, who are unknown to the unit managers, are normally "subject to a random placement unless the incoming inmate can identify a particular inmate with whom he should not be celled." *Id.* (Vol. XII, at 2335, 2337, 2342).

It is important to emphasize what is meant by "random" placement. The word "random" was accepted by Donn Beaver, a prison employee who managed one of the housing units, as a fair description of the cell-assignment procedure for newly arrived inmates at the penitentiary. (Vol. VI, at 989:5–19 ("Q. Is that more or less a random choice as to where he goes? A. I would say yes.").) The decision regarding which cell the new arrival will be placed in is normally made *before* any consideration can be given to important background information gathered about the new inmate prior to his entering the prison. *Id.* at 1477 (Vol. IX, at 1751–53).

A bit of detail is required to understand the significance of this point.

Adult males sentenced to prison in Nebraska undergo an examination called a "classification study." *Id.* at 1476 (Vol. IX, at 1703:9–1704:16). This study, compiled by a wide range of specialists at an institution separate from the penitentiary (the Diagnostic and Evaluation Center (D & E)), attempts to summarize and evaluate: (1) the legal aspects of the crime of which the inmate stands convicted; (2) the criminal history of the inmate; (3) the medical history of the inmate; (4) the psychological status of the inmate; and (5) the needs and problems of the inmate. *Id.* Associated with the "classification study" is a "scoring instrument" that amounts to a shorthand compilation of the factors examined by the "classification study." *Id.* at 1476–77 (Ex. 328, at 55–56; Vol. IX, at 1710).

Both the "classification study" and the "scoring instrument" are sent to the institution where the inmate is to be housed, but the "classification study" does not always arrive with the inmate upon his entry into the prison. *Id.* at 1477 (Vol. IX, at 1718). However, the "scoring instrument" normally arrives with the inmate. *Id.* (Vol. IX, at 1719).

Both the "classification study" and the "scoring instrument" could easily be used to predict inmate compatibility for cell-assignment purposes *if those documents are consulted before a housing decision is made. Id.* at 1477. No one disputes this point. Indeed, Hopkins testified that "I think all the information contained there will give the people involved . . . an opportunity to make appropriate cell assignments." (Prelim.Inj.Hr'g Tr. at 47:8–19.)

As Judges Piester and Cambridge found, the difficulty is that the "classification[6] system is used only to determine the institution to which an inmate will be sent. Vol. IX, at 1751–53. Beyond that, neither the study nor

---

**6.** The "classification study" mentioned in the text takes place at the Diagnostic and Evaluation Center. (Vol. VII, at 1146:2–6.) As will be discussed later, the penitentiary also holds an "initial classification" meeting within seven days of the inmate's arrival at the penitentiary. (Ex. 251.) The two should not be confused, however. The former is an in-depth, multidisciplinary, written case study and appraisal of the inmate, while the latter is a brief meeting between the inmate and certain penitentiary staff.

the instrument is used to predict compatibility of inmates." *Id.* Thus, unless the placement decision makers—the unit managers who run the housing units and assign the cells—know the newly arrived inmate, as from a previous incarceration, the cell assignments are made blindly as far as inmate compatibility is concerned. *Id.* at 1477. ("When no prison official is familiar with the incoming inmate, that inmate will be subject to random placement unless the incoming inmate can identify a particular inmate with whom he should not be celled.") *Id.* (Vol. XII, at 2335, 2337, 2342). In other words, when the newly arrived inmate is unknown to the unit managers, the only factor in cell assignment becomes "space availability" and not whether one inmate will harm the other while both occupy the "available space." *Id.* (Vol. VII, at 1199:25–1200:13).

**2.**

Clarke and Hopkins attempt to relitigate these previous factual findings in their primary remand brief. (Defs.' Br. at 21–29.) They advance two arguments, neither of which are persuasive.

**a.**

Initially, the defendants argue that the unit managers make a considered decision about inmate compatibility before making cell assignments. This assertion is untrue.

Jeffrey Uttecht, who coordinates the cell-assignment process, explained at trial what actually happens. Uttecht is normally told on Tuesday how many new inmates are coming to the penitentiary by Fred Britten, who has administrative responsibility for all the housing units. (Vol. XII, at 2297:24–2298:9.) On average, the penitentiary receives 8 to 10 inmates each week as part of this process. (Prelim.Inj.Hr'g Tr. at 83:4–15.) Thus, the penitentiary receives between 400 and 500 newly arrived inmates every year.

Once he has the numbers, Uttecht contacts the unit managers, the individuals who run the housing units. The purpose of this contact is to "basically find out exactly where they want to assign that particular inmate." (Vol. XII, at 2298:22–23.) In response to a question put to him by defense counsel as to "what factors are considered by yourself and the other unit managers in determining how many inmates they're going to be receiving into their unit," Uttecht answered, "Available bunks." (Vol. XII, at 2299:16–20.)

It is during this discussion about "available bunks" that a decision is made as to specific cell assignments. The information the decision makers have about a newly arrived inmate is very limited. Unless the unit managers know the new inmate,[7] the decision makers have only the "names, numbers, racial breakdown, [and] custody [level]." (Vol. XII, at 2299:21–25.) "[O]n occasion" a "problematic inmate" will have been identified in the information given to Uttecht by Britten. (Vol. XII, at 2300:1–3.)

Uttecht freely admitted the paucity of information. For example, Uttecht testified that when cell assignments are made, the housing unit managers normally do not know the age of the inmate, whether he is large or small, or the length of his sentence. (Vol. XII, at 2337:18–2338:18.)

A representative sample of Uttecht's direct examination testimony concerning these points, *adduced by defense counsel*, is set forth below:

Q. Now, your cell assignment has been made though prior to reviewing [the scoring] instrument; is that right?

A. That's true.

Q. So that type of information is done after your initial assignment but when you're meeting with them at the initial class?

A. Right.

Q. Do you know anything about—what do you know about the inmate who's coming to the system when you're making a cell assignment?

A. Their name, their custody, their [race], and that's about it.

---

**7.** Uttecht stated that "frequently" someone recognizes an incoming inmate, as from a prior incarceration. (Vol. XII, at 2299:4.) There is no quantitative evidence of the "frequency" of such recognition, however. The housing unit managers are unlikely to "recognize" a large segment of the 500 newly arrived inmates each year since 42 percent of them are first-time offenders. *Jensen I*, 807 F.Supp. at 1471 (Vol. VII, at 1170:2–24).

Q. So what factors do you consider, I guess, is it your testimony that you look at what space is available and what you know about existing inmates in your population as to how you can place an inmate with them?

A. Space available and to try to incorporate an appropriate racial breakdown in the unit.

(Vol. XII, at 2307:22–2308:15.)

In summary, the housing managers know very little about an incoming inmate when they make a cell assignment. They do not review either the "classification study" or the "scoring instrument" prior to making cell assignments. Two factors influence the cell-assignment decision, and those factors are space and race. Accordingly, it is simply not factually accurate to suggest that the cell-assignment decision is a carefully considered decision based on the issue of inmate compatibility.

**b.**

The defendants next argue that the process described by Uttecht is not really a cell-assignment decision at all. The defendants claim that because every inmate attends a meeting with Uttecht (called an "initial classification" meeting) shortly after arriving at the penitentiary, any problems with cell assignments can be ironed out at that time because Uttecht will have the "scoring instrument" (but not necessarily the "classification study") for each new inmate. (Vol. XII, at 2301:2–2302:22.)

There are two factual problems with this assertion that render it utterly disingenuous. The first problem is that the meeting relied upon by the defendants takes place after cell assignments have already been made. The

second problem is that this meeting is not intended to, and normally does not, change the cell assignments previously made.

As Uttecht repeatedly told *defense counsel,* the "initial classification" meeting takes place *after* the cell-assignment decision has already been made. (Vol. XII, at 2305:19–25; 2307:22–24.) Indeed, although the meeting is frequently held on Wednesday, when new inmates typically arrive, according to penitentiary regulations this "initial classification" meeting can be held up to seven days after an inmate enters the penitentiary. (Ex. 251, at 1, ¶ II(F).)

Moreover, the cell assignment decision is not normally changed at the "initial classification" meeting unless the inmate can convince Uttecht there is a problem with his cell assignment. In fact, inmate compatibility for cell-assignment purposes is not even one of the reasons for holding the meeting.

Clarke admitted that penitentiary regulations setting forth the purposes of the "initial classification" meeting provide "no reference to making any determination as to compatibility of cell mates from that initial classification." (Vol. VII, at 1144:16–1146:1; Ex. 251.) The inmates confirmed that no questions were asked about cellmate compatibility at the "initial classification" meeting. (Vol. I, at 44:17–45:9.) Even the assistant director of DCS, who was responsible for "classification" for all Nebraska prisons, agreed that neither the "classification study" nor the "scoring instrument" was used "in any attempt to try and predict the compatibility of cell mates." (Vol. IX, at 1753:2–6.) [8]

Teresa Mulkey, a housing unit manager who also chaired the "initial classification"

8. The assistant director of DCS also made clear that the so-called "central monitoring system" has no relevance to cell-assignment decisions within a particular institution once both potential cellmates are at that institution. If DCS employees know two inmates cannot be kept at the same prison because there are problems between them, that information is entered into a "central monitoring system," a computer data base *available to all institutions.* (Vol. IX, at 1711:12–1712:12.) The system allows DCS to assign two inmates who have problems with one another to different institutions. (Vol. IX, at 1750:1–9.) The central monitoring system de-

pends upon inmate reports to determine if there are problems between inmates. (Vol. IX, at 1751:1–7.) According to the assistant director, the only function of the central monitoring system is to "keep the obvious problems from each other"; there is no other purpose for maintaining the system. (Vol. IX, at 1751:13–22.) As the assistant director also stated, "the whole purpose of the central monitoring system is to identify inmates who have identified potential problems [with other inmates]" so "we will not assign those inmates to the same institution." (Vol. IX, at 1750:1–9.)

meetings when Uttecht was absent, forthrightly confirmed both that the housing decision was made before the "initial classification" meeting and that the "initial classification" meeting did not deal with cell-assignment issues:

Q. Do you receive any custody study or classification study, then, from Diagnostic and Evaluation Center?

A. None until after the inmate arrives at the penitentiary. It comes over at the same time the inmate arrives.

Q. So by the time you receive that study, have you already decided what cell this inmate's going to go to?

A. Yes.

. . . .

Q. Now, do you interview new inmates before they come into your housing unit?

A. Not unless I'm doing initial classification for Mr. Uttecht. Otherwise, no.

. . . .

Q. And sometimes you fill in for him?

A. Yes.

Q. Is that interview, is that essentially an orientation interview?

A. Yes. We give information to the inmates about—we tell them who their counselor's name is, we let them know where they're living, we tell them about the orientation to the penitentiary as a whole. We talk to them about the orientation they'll receive as soon as they get to the housing units. We explain how the doors are run, how to sign up for phones, how to go to meals.

Q. Job assignments?

A. Right. Just the real basics.

Q. They're—I assume this is an orientation; you're not actually interviewing them and asking preferences or anything on their part, then, are you?

A. Preferences in relation to what?

Q. As to who they would cell with or—

A. No, we don't ask them preferences.

Q. So there really isn't any input at that time from the inmates as to who or what type of person they would want to cell with?

A. No.

. . . .

Q. Going back to what you said earlier, you have to put the incoming inmates essentially where you've got space?

A. Yes.

(Vol. VII, at 1200:4–13; 1201:3–6, 10–25; 1202:1–9, 22–25.)

However, even if Uttecht infrequently asked about cellmate problems at this meeting, since a newly arrived inmate often would not know whether he had a "problem" when he conferred with Uttecht, the initial random cell-assignment decision normally remained unchanged. Cross-examination of Uttecht convincingly emphasized this point:

Q. Okay. And at the time that you and these other people from the mental health people [*sic*] talk with him, he's already preliminarily been given a cell assignment in a housing unit; hasn't he?

A. Right.

Q. And a job?

A. Right.

Q. And the only time that that cell assignment's going to change is if he comes in and has a problem with a person that he knows to be in that housing unit?

A. Yes, but it doesn't become official until we go through the hearing.

. . . .

Q. But the only change that's going to occur is if he has a problem with an inmate in a housing unit and he might change his cell?

A. Or his particular job.

. . . .

Q. And the—but as far as this incoming inmate, you still have to place him in a cell probably within the housing unit that's been selected for him?

A. Not always so.

Q. Well, unless it's protective custody or something else he's going to have to go into one of the four main housing units?

A. Right.

Q. And the only reason to change from the one that's been previously selected for him is if there's a known problem with one

of the inmates already in that housing unit?

A. That's correct.

Q. Is there any way that this incoming inmate is going to know who's in that housing unit to alert you that he may have a problem with him?

A. *Sometimes they know, sometimes they don't.*

(Vol. XII, at 2335:13–25; 2337:1–4; 2342:6–23 (emphasis added).) Donn Beaver, a housing unit manager, gave similar testimony. (Vol. VI, at 977:6–978:15.)

That the cell-assignment decision was not normally changed no matter what the inmate said at his "initial classification" meeting was also pointedly illustrated during Judge Piester's questioning of Uttecht and the subsequent examination of Uttecht by counsel for the plaintiffs. Uttecht testified that even when he learned at the "initial classification" meeting that a newly arrived inmate had a gang affiliation, such information did not change the cell assignment:

BY THE COURT:

Q. You mentioned at the time of the initial classification inquiry that some questioning is made with respect to gang affiliation. What is done with that information if there's a positive response?

A. There's a staff member at the institution that maintains gang intelligence for monitoring and supervision, keep an eye on cliques, et cetera.

Q. What does that do, if anything, to your initial cell placement?

A. I can't say that it's had any effect at this time.

THE COURT: That's all my questions. Ms. Weeks [defense counsel], anything on my questions?

MS. WEEKS: No, Your Honor.

THE COURT: Mr. Hemmerling [plaintiffs' counsel]?

BY MR. HEMMERLING:

Q. Mr. Uttecht, about gang affiliation, have you ever had any inmates that have said we're affiliated with a gang?

A. Yes.

Q. But that hasn't changed how you cell them at all?

A. Say again, please.

Q. That hasn't changed who you celled them with?

A. It hasn't at this time.

(Vol. XII, at 2362:12–2363:12.)

In summary, it is factually misleading to suggest that the "initial classification" meeting with Uttecht amounts to the "real" cell-assignment decision. It is equally misleading to suggest that the "initial classification" meeting serves as a meaningful check on the cell-assignment decision insofar as the issue of inmate compatibility is concerned. The fact is that cell assignments for newly arrived inmates are blindly made on a random basis without regard to classification information and cellmate compatibility.

## C. CLARKE AND HOPKINS ACTUALLY KNEW THAT NEWLY ARRIVED INMATES WERE FREQUENTLY RANDOMLY DOUBLE-CELLED.

■ Clarke and Hopkins argue that the "initial classification" meeting at the penitentiary takes into account classification information, at least informally; therefore, the cell-assignment decisions are not random in terms of inmate compatibility. However, as pointed out earlier, the facts simply do not support this assertion. Moreover, I am convinced that Clarke and Hopkins actually knew of the truly random nature of the cell assignments regarding newly arrived inmates; that is, they actually knew that double-cell assignments were frequently made regarding newly arrived inmates without consideration of classification information and without regard to inmate compatibility. I arrived at this conclusion for the following five reasons.

First, both Clarke and Hopkins were intimately familiar with the workings of the penitentiary. They were not ignorant of the random nature of the cell assignments regarding newly arrived inmates because they knew how the prison operated.

Clarke began work at the penitentiary in approximately 1982, serving as associate warden, deputy warden, and warden (from June,

1987, through August, 1990). He became director of all Nebraska prisons in August, 1990. (Vol. VII, at 1127:23–1130:5.) Hopkins became deputy warden at the penitentiary in July, 1987, later served as interim warden, and became warden of the penitentiary in January, 1991. (Vol. XV, at 2794:20–25.)

According to their own testimony, as wardens these men were "responsible for the overall operation of the Nebraska State Penitentiary." (Vol. XV, at 2796:7–12.) More specifically, as deputy wardens (second in command), both men had direct ongoing contact with housing unit procedures. The unit administrator, who oversaw all the housing units and supervised the penitentiary's classification efforts, (Vol. XII, at 2211:23–2212:3; 2237:21–2238:19; 2293:2–3), testified that he reported to the deputy warden. (Vol. XII, at 2285:4–16.) Clarke had also been an "associate warden of custody," and as such was specifically responsible for "safety [and] security" at the penitentiary. (Vol. VII, at 1129:7–8; 22–23.) Immediately before coming to the penitentiary, Hopkins served as security coordinator for all the adult prisons in Nebraska. (Vol. XV, at 2794:20–21.) In this capacity it was his responsibility to conduct "special investigations" and "security audits" of the various adult prisons. (Vol. XV, at 2795:4–9.) As a part of his job, Hopkins was specifically required to review the "procedures at the facilities" regarding, among other things, "safety" and "security." (Vol. XV, at 2795:10–13.)

Second, it was a well-known fact within DCS and the penitentiary that classification information was not used to determine inmate compatibility with regard to newly arrived inmates and that the procedure was "random." Thus, Clarke and Hopkins cannot credibly feign ignorance.

Indeed, Clarke's deputy, the assistant director of DCS, who was responsible for "classification" for all Nebraska prisons, testified that neither the "classification study" nor the "scoring instrument" was used "in any attempt to try and predict the compatibility of cell mates." (Vol. IX, at 1753:2–6.) Donn

Beaver, a penitentiary housing unit manager, readily accepted the word "random" as a fair description of the cell-assignment procedure. (Vol. VI, at 989:5–19.) Furthermore, Teresa Mulkey, a housing unit manager who also chaired the "initial classification" meetings, testified without equivocation that the housing decision was made before the "initial classification" meeting, that the decision was made before classification information became available, and that the "initial classification" meeting did not deal with cell-assignment issues. (Vol. VII, at 1200:4–13; 1201:3–6, 10–25; 1202:1–9, 22–25.)

Third, the statements of Clarke and Hopkins confirm that they understood how the process really worked. Two examples illustrate this point.

As Clarke admitted at trial, he knew that prior to the newly arrived inmate's participation in the "initial classification" meeting, "*[us]ually, they will already have identified prior to that person coming before that committee where the person's going to live.* Unless something occurs during that process ... that causes them to change their mind, *most likely that person will get that cell.*" (Vol. VII, at 1154:22–1155:3 (emphasis added).) Clarke actually knew the truth, and in this instance he spoke it.

Keeping in mind Uttecht's repeated direct-examination admission, upon inquiry by defense counsel, that the factor driving the cell-assignment decision was "[a]vailable bunks," (Vol. XII, at 2299:16–20), or "[s]pace," (Vol. XII, at 2307:22–2308:15), Hopkins's response to an inmate's double-cell grievance is instructive regarding his knowledge of how the process really worked.

In December, 1992, after much of the testimony in this case had been taken during the summer of 1991, Hopkins responded to an inmate's cell complaint by stating that "the penitentiary administration *will continue* to make living assignments *based on overcrowded situations.*" (Prelim.Inj.Hr'g Tr. at 55:7–56:25 (emphasis added).) [9] Like Clarke, Hopkins's own words confirm that he actually knew the truth.

---

9. "[T]he inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions." *Farmer,* —— U.S. at ——, 114 S.Ct. at 1983.

Fourth, both men participated in the decision to increase the number of double cells used at the penitentiary. They would have known of the intense pressure on penitentiary staff to accommodate approximately 500 newly arrived inmates each year, regardless of compatibility, in a prison which was "bursting at the seams." Or as Mulkey agreed, "you have to put the incoming inmates essentially where you've got space." (Vol. VII, at 1202:22–25.)

Clarke testified that he personally participated in the decision-making process regarding increased utilization of "double cells" at the penitentiary and that "during my tenure we increased the number of double cells at the state penitentiary by five cells per unit." (Vol. VIII, at 1423:8–13.) Clarke was asked "as a warden whether or not we could house more individuals at the state penitentiary, and my response was affirmative." (Vol. VIII, at 1423:8–11.) In arriving at this decision, Clarke specifically studied "the level of dangerousness of the institution. Things such as assaults, serious assaults." (Vol. VIII, at 1424:16–18.) Yet, as this court previously observed, Clarke testified that he believed the housing units were "bursting at their seams." *Id.* at 1468 (Vol. VIII, at 1406:1–3).

Hopkins testified that he participated, along with the former warden (Clarke), in the administrative process which set the "capacity level" of the housing units. (Vol. XV, at 2896:13–20.) Hopkins knew that the "capacity level," set with his input as deputy warden, was substantially over the design capacity of the housing units at the penitentiary. (Vol. XV, at 2840:24–2842:22.) Moreover, as warden, Hopkins authorized the increased use of double cells. (Prelim.Inj.Hr'g Tr. at 55:7–11.) Yet Hopkins had publicly stated that the "increasing inmate population is the biggest challenge the prison faces," and he reaffirmed that belief at trial. (Vol. XV, at 2843:2–13.)

Fifth, Clarke and Hopkins rely upon the "initial classification" meeting for their asser-

tion that inmate compatibility was in fact considered. Yet the penitentiary regulation that sets out the goals and procedures of the "initial classification" meeting contains nothing whatever to do with cell assignments and inmate compatibility. (Ex. 251.) Clarke and Hopkins knew the content of their own regulation. Such knowledge renders any claim of ignorance of what actually happened at the "initial classification" meeting absurd.

Clarke admitted the prison regulation setting forth the goals of the penitentiary's initial classification meeting did not even mention inmate compatibility. (Vol. VII, at 1144:16–1146:1; Ex. 251.) [10] He could hardly do otherwise since *he personally signed the "initial classification" regulation* involved here on July 13, 1987, as warden. (Ex. 251, at 4–5.) Neither could Hopkins deny knowledge of the regulation since he was deputy warden when Clarke signed the "initial classification" regulation for the penitentiary. (*Compare* Vol. XV, at 2794:22 *with* Ex. 251.) There is no evidence and no claim that Hopkins amended or revoked the regulation when he became warden.

In summary, I have not simply found that Clarke and Hopkins should have known of the real cell-assignment process or that a reasonable person would have known of the real process. Rather, I have found that Clarke and Hopkins actually knew that the cell-assignment procedure for newly arrived inmates was random because it was frequently made without consideration of classification information and without any attempt to determine inmate compatibility. *Farmer,* —— U.S. at —— – ——, 114 S.Ct. at 1981–82.

## D. THE LEVEL OF VIOLENCE AT THE PENITENTIARY, INCLUDING VIOLENCE IN THE DOUBLE CELLS, POSED A SUBSTANTIAL RISK OF SERIOUS HARM TO THE PLAINTIFFS.

■ For the sake of clarity, it is appropriate to reiterate what Judges Piester and

---

**10.** These types of written prison regulations (called "operational memoranda") required approval by the director of the Department of Correctional Services and the warden of the penitentiary. *See, e.g., Shaddy v. Gunter,* 690 F.Supp. 860, 861 (D.Neb.1988) ("Operational memoranda are rules tailored to the unique needs of individual facilities within the Department of Correctional Services and derived from administrative regulations promulgated by the director of that department.")

Cambridge found with regard to the so-called first component of any Eighth Amendment "failure-to-protect" claim asserted by inmates. *Jensen IV,* 73 F.3d at 810 (Inmates must first "demonstrate that they are 'incarcerated under conditions posing a substantial risk of serious harm.' ") (quoting *Farmer,* —— U.S. at ——, 114 S.Ct. at 1977). It is then appropriate to deal with the defendants' effort to expand the scope of the remand.

### 1.

The essence of this court's holding regarding the first component of the Eighth Amendment claim was that the "level of violence in the four main housing units exceeds what can be characterized as an unavoidable level . . . [and that such] violence has carried over into the double cells. . . ." *Jensen I,* 807 F.Supp. at 1483. This court specifically held:

> The level of violence in the four main housing units exceeds what can be characterized as an unavoidable level. That violence has carried over into the double cells where tensions are increased by the limited cell size, noise, lack of privacy, restricted surveillance of the inmates confined therein, deterrents to the reporting of assaults and other violations of prison rules by a cellmate, suspicions about the presence of contraband, and the large amount of time spent confined on a lockdown status with a cellmate.

*Id.*

This decision was based upon compelling evidence presented to the court during 18 days of trial:

1. The housing units have been 40 to 65 percent over capacity for 10 years, with the "overcrowding" trend consistently increasing over time. *Id.* at 1468.

2. Two inmates are housed together in a 74–square–foot cell designed for one person. *Id.*

3. Tensions in the double cells are increased by:

> (a) excessive noise, *id.* at 1469;

> (b) the adverse impact on ventilation of welding shut windows in the double cells, *id.* at 1470;

> (c) the nearly complete lack of visual surveillance for the purpose of detecting violence due to the construction of the double cells and the cell block, *id.* at 1470; Exs. 6B & 6C;

> (d) the limited value of the intercom system for the purpose of detecting violence in the double cells, *id.* at 1471;

> (e) a reluctance on the part of inmates to report the misconduct of other inmates, *id.* at 1472;

> (f) a prison rule that "is a substantial deterrent" to the reporting of violent altercations because it requires that the victim receive a misconduct report and go through disciplinary proceedings, *id.;*

> (g) a prison rule that is a deterrent to the reporting of violent altercations because it does not permit prison officials to issue a misconduct report without corroboration, *id.;*

> (h) a contraband rule that allows one cellmate to be punished for the contraband of the other cellmate, *id.* at 1475;

> (i) the lack of privacy occasioned by placing two men in a cell designed for one man, *id.* at 1476;

> (j) the fact that most inmates spend 10 to 14 hours a day in the double cells, *id.* at 1478.

4. Statistical information maintained by the defendants indicates "a grim picture of a growing problem with violence at the penitentiary" generally, including information that the number of inmates *convicted* of violent offenses (assaults, aggravated assaults, fights, and threats of bodily injury) more than tripled from 1983 (77) to 1990 (289) as the average number of inmates over design capacity rose from 41 percent in 1981 to 60 percent in 1990. *Id.* at 1468 n. 4, 1472–73. (*Compare* Exs. 291–299 *with* Ex. 321.) Moreover, the number of inmates checking into protective custody increased dramatically (by as much as 100 percent). *Id.* at 1472.

5. There was reason to believe the statistical information substantially underrepresented the level of violence in the penitentiary because of the inmates' reluctance to inform on each other and because of two

prison rules that discouraged the reporting of incidents of violence. *Id.* at 1472.

6. "Not only is the penitentiary a violent place institution wide, there was also evidence that a problem with violence exists within the double cells." *Id.* at 1473. In particular, various inmates testified that violent confrontations between cellmates were routine, and the inmates frequently gave specific examples. *Id.* at 1475 (inmate Benzel, Vol. I, at 53:8–23; inmate Lyman, Vol. I, at 111:14–24, 116:13–117:9, 119:11–16; inmate Bradley, Vol. II, at 240:22–241:25; inmate El–Tabech, Vol. II, at 316:11–13; inmate Luna, Vol. III, at 415:21–23; and inmate Crisp, Vol. III, at 461:5–8).

7. The violence in the double cells was poignantly illustrated by the testimony of two inmates, one a perpetrator (inmate Hart) and the other a victim (inmate Jensen).

(a) Inmate Hart, "an aggressive, loathsome individual," testified about his predatory behavior with "complete indifference." The defendants "provided no factual basis to conclude that Hart has exaggerated or fabricated his exploits." *Id.* at 1473–75. Hart has been continually double-celled despite the following:

(i) While in prison in Oregon for attempted murder, Hart was celled with another man. Hart assaulted his cellmate and "slit his throat," "slic[ing] [him] from the right shoulder ... and up from his ass." After using a hammer to beat the man's head, Hart walked away when he thought the man was dead. Hart was then transferred to Nebraska. *Id.* at 1473–74 (Vol. V, at 835:20–837:21; 867:5–7).

(ii) When Hart arrived at D & E, he reported the incident in Oregon. After he assaulted an inmate who was celled with him at D & E, Hart was given a single cell. Upon being transferred to the penitentiary, however, Hart was immediately double-celled. He had a "con-

frontation" with his cellmate, and the cellmate moved out. Hart requested a single cell, but his requests were denied. *Id.* at 1474 (Vol. V, at 839:22–840:4; 840:16–841:16; 842:3–7).

(iii) Hart subsequently engaged in various types of assaultive behavior against his cellmates. These incidents ranged from sexual assaults (only "four out of seventeen [cellmates was I] unable to encourage or coerce into a homosexual act") to other types of assaults (placing Clorox in his cellmate's eye solution and toilet bowl cleaner in an inhaler) to extortion (of an older inmate who had a heart problem). Five of Hart's cellmates checked into protective custody. *Id.* at 1474–75 (Vol. V, at 851:22–853:19; 855:2–857:5; 859:21–860:24; Vol. VI, at 878:11–24; 891:1–6; 893:19–23; 895:15–16).[11]

(b) Inmate Jensen was transferred from a minimum security facility to a double cell in one of the housing units. Jensen was a relatively small (5 feet 10 inches, 145 pounds), 21–year–old man incarcerated for theft. *Id.* at 1473 (Vol. IV, at 598:4–25; 612:3–10). This is what happened to him three days after he was first placed in a double cell:

(i) Jensen was housed with inmate Svitak, a tall, 250–pound, muscle-bound man about 45 years of age who was serving a life sentence. Svitak had previously assaulted a staff member, and he made it clear to the staff that he did not want a cellmate. *Id.* (Vol. IV, at 600:10–23; 605:6–24; Vol. XIII, at 2661:17–23; Ex. 22, at 39).

(ii) On September 27, 1987, Jensen and Svitak met. Their meeting took place during the lockdown preceding the evening meal. Svitak told Jensen he did not want a cellmate and Jensen should move out. Jensen told Svitak he had already asked to be placed in a cell with

---

11. Hart's testimony explains why the failure to consider inmate compatibility for newly arrived inmates impacts upon "veteran" inmates as well. As a "newly arrived" inmate, Hart was the aggressor. The failure to consider compatibility thus impacts upon veteran inmates who are celled with "newly arrived" inmates. This is the reason why "if a 'newly arrived' inmate is placed with a 'long-term' inmate," the "injunction specifically requires [penitentiary] officials to examine the likelihood of violence on the part of both men if they are to be celled together." *Jensen III*, 869 F.Supp. at 1467 (footnote omitted) (emphasis in original).

his brother, who was also at the penitentiary. The next day Svitak reminded Jensen "in a serious manner" that he needed to move out. Jensen then sent a written request to Donn Beaver asking to be moved. *Id.* (Vol. IV, at 604:15–605:14; 606:9–20; 607:7–17).

(iii) On September 30, Jensen was awakened by Svitak's punching him in the face. The cell was locked, as it always was in the morning. Jensen screamed for help. The incident continued for 10 to 15 minutes. When the door was unlocked, Jensen left the cell and Svitak went to breakfast. Jensen was moved to a another cell. Although Jensen reported the assault, no action was taken against Svitak because there was no corroborating evidence. *Id.* (Vol. IV, at 610:6–22; 611:4–14; 612:14–23; 613:1–614:9; 619:10–15; 620:12–13; 621:6–11; 622:10–12; Vol. XIII, at 2481:14–19).

### 2.

Much of Clarke and Hopkins's brief on remand is an attempt to reargue these findings. However, as the plaintiffs point out, the court of appeals' remand order is clear and limited. As observed earlier, the court of appeals directed me to specifically "find whether the defendants actually knew of and disregarded a substantial risk to the safety of the plaintiffs." *Jensen IV,* 73 F.3d at 811. The court of appeals was specifically concerned with "the subjective-state-of-mind component of deliberate indifference described in *Farmer.*" *Id.* 73 F.3d at 811. The *Jensen IV* court reserved judgment on whether the plaintiffs were exposed to a substantial risk of physical harm. *Jensen IV,* 73 F.3d at 810 ("We do not reach the first issue, because we must remand this case for further findings on the second."). Thus, the *Jensen IV* remand order is limited to the "second" question of whether the defendants were "subjectively aware of a substantial risk of harm to the plaintiffs." *Id.* at 811. I therefore make no effort to address the arguments of Clarke and Hopkins that the plaintiffs failed to prove the first component of their Eighth Amendment claim.

### E. CLARKE AND HOPKINS ACTUALLY KNEW THE LEVEL OF VIOLENCE AT THE PENITENTIARY, INCLUDING VIOLENCE IN THE DOUBLE CELLS, POSED A SUBSTANTIAL RISK OF SERIOUS HARM TO THE PLAINTIFFS.

Once again, I reiterate that the pertinent question is not whether Clarke and Hopkins should have known of the substantial risk of harm or whether a reasonable person would have known of the substantial risk of harm. Rather, the pertinent question is whether Clarke and Hopkins actually knew the level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs. *Farmer,* —— U.S. at ——–——, 114 S.Ct. at 1981–82.

As the *Farmer* Court recognized, this is not an unusually difficult question to answer. Essentially, the question of "[w]hether a prison official had the requisite knowledge of a substantial risk [is] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at ——, 114 S.Ct. at 1981 (citations omitted). Simply put, *Farmer* does not require the plaintiffs to produce a "smoking gun" in order to prevail.

### 1.

I find and conclude that both Clarke and Hopkins actually knew the level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs. I arrived at this conclusion for the following five reasons.

First, both defendants were specifically provided with credible evidence of a substantial level of violence on a monthly basis. From this evidence alone, Clarke and Hopkins would have known the level of violence in the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs.

For example, Clarke was actually informed of virtually every *verified* incident of violence

that had occurred at the penitentiary since at least 1983. Likewise, Hopkins was actually informed of virtually every *verified* incident of violence that had occurred at the penitentiary since he became deputy warden in 1987. This conclusion is inescapable because the monthly disciplinary reports from 1983 to 1991, (Exs. 291–299), which showed, among other things, disciplinary *convictions* for assaults or threats of violence, were distributed to the warden and deputy warden. *Jensen I,* 807 F.Supp. at 1472. Indeed, many of the reports received in evidence show a distribution legend indicating they were distributed to "Warden Clarke" and "Deputy Warden Hopkins." (Exs. 295(f)–296(i).)

Moreover, Clarke admitted that he received reports of sexual assaults at the penitentiary even after he became director of DCS. (Vol. VIII, at 1388:22–1389:5.) Clarke also admitted reading the reports when he stated that "[i]f they were reported, I would know about it." (Vol. VIII, at 1388:24–25.) Hopkins admitted that since becoming deputy warden he also received reports showing not only the convictions, but also the number of charges (misconduct reports). (Vol. XIV, at 2784:10–25; Vol. XV, at 2870:22–2871:20.) Hopkins also admitted reviewing the reports. (Vol. XV, at 2864:14–2865:3.)

The reports that Clarke and Hopkins received and read demonstrated there was a substantial risk of assault virtually anywhere within the penitentiary. From this evidence alone, it would have been clear to anyone who cared to see that the level of violence within the cells at the penitentiary was very significant.

For example, even Clarke and Hopkins admit that *the reports* delivered to the warden and the deputy warden during this period of time *showed there were 1,774 convictions for assaults and threats of assault.* (Defs.' Br. at 10.) Thus, as Clarke and Hopkins also admit, during the time frame captured by the evidence, there was a *verified* assault or threat of assault at the penitentiary *"every other day."* (*Id.* at 13 (emphasis added).)

Second, both Clarke and Hopkins were well aware that the statistical information underestimated the substantial risk of violence, particularly violence in the double cells. For example, Clarke testified:

> I know that offenders do not always report incidents, happenings within the institution, either may they be assaults or other observations that they may have made.
>
> I have reason to believe that offenders do not always report problems for a number of reasons. One of those reasons might be for fear of retaliation from other offenders within the institution, or from the person who is the aggressor.

(Vol. VIII, at 1420:19–1421:4.)

When asked whether "those fears of retaliation would be increased if the assailant were a cell mate," Clarke, in a guarded understatement, answered: "One could so assume." (Vol. VIII, at 1421:5–8.)

Clarke quickly added, however, that if "they can give staff reasons" then "that can be corrected." (Vol. VIII, at 1421:8–13.) However, this qualification seems perverse given Clarke's knowledge of the lack of surveillance in the cells and the two prison rules that deterred reporting of assaults or threats of assault.

As noted earlier, their construction makes it very difficult, if not impossible, to visually monitor the cells during the 10 to 14 hours each day that two cellmates are locked in. *Jensen I,* 807 F.Supp. at 1470 (Exs. 6B & 6C). Moreover, it was obvious the intercom was not a viable substitute for visual surveillance. *Jensen I,* 807 F.Supp. at 1471 (Vol. IV, at 613:1–5) (Jensen unavailingly yelled for help just three feet from his door while being attacked); (Vol. VI, at 1060–74) (sound of Harpster's head being pummelled into table by cellmate undetected by intercom system).

Both Clarke and Hopkins clearly knew how the cells were constructed because they toured the housing units as frequently as once a month. (Vol. XVIII, at 3623:9–11.) Indeed, Clarke admitted that "we are not in a position to observe those individuals from a central location." (Vol. VIII, at 1425:20–25.) Clarke and Hopkins were thus aware of the obvious difficulty in monitoring the cells.

Moreover, both men knew the prison rules. (Vol. XVIII, at 3641:19–3642:5.) They knew of one prison rule that was "a substantial deterrent" to the reporting of violent altercations because it required that the victim receive a misconduct report and go through disciplinary proceedings. *Id.* at 1472. They also knew of another prison rule that deterred the reporting of violent altercations by not allowing prison officials to issue a misconduct report without corroboration. *Id.*

Accordingly, Clarke and Hopkins knew that an inmate who spends 10 to 14 hours in a double cell is not likely to report a beating or threat of a beating by his cellmate if that inmate understands the prison rules and cannot provide his guards with corroboration. This painfully obvious point was illustrated by the testimony of inmate Jensen, only recently arrived at the penitentiary, regarding the beating he suffered at the hands of inmate Svitak after being placed in a double cell. *Id.* at 1473. Within three days of his arrival, Jensen was assaulted in his cell. The beating lasted 10 to 15 minutes, and Jensen screamed as the assault took place. There was no intervention by the guards. "Jensen reported the assault, but prison officials took no action. There was no corroborating evidence." *Id.*

Third, as participants in the decision to increase utilization of double cells, both Clarke and Hopkins knew that verified reports of violence increased as the number of double cells increased. Therefore, they knew that as the prison became more crowded, violence increased throughout the penitentiary.[12]

As a factual matter, it is admitted that both Clarke and Hopkins participated in the decision to increase utilization of double cells at the penitentiary. For example, Clarke testified that "during my tenure we increased the number of double cells at the state penitentiary by five cells per unit." (Vol. VIII, at 1423:8–13.) Clarke was asked "as a warden whether or not we could house more individuals at the state penitentiary, and my response was affirmative." (Vol. VIII, at 1423:8–11.) In arriving at this decision, Clarke specifically studied "the level of dangerousness of the institution. Things such as assaults, serious assaults." (Vol. VIII, at 1424:16–18.)

The evidence regarding Hopkins was similar. Hopkins testified that as deputy warden he participated in the administrative process that set the "capacity level" of the housing units. (Vol. XV, at 2896:13–20.) Hopkins knew that the "capacity level," which was set with his input as deputy warden, was substantially over the design capacity of the housing units at the penitentiary. (Vol. XV, at 2840:24–2842:4.) Moreover, after becoming warden, Hopkins authorized the increased use of double cells. (Prelim.Inj.Hr'g Tr. at 55:7–11.) As Hopkins stated, he knew that the "increasing inmate population is the biggest challenge the prison faces." (Vol. XV, at 2843:2–13.)

As a factual matter, it is also undisputed that as the number of double cells increased, so did the *convictions* for assaults and threats of assault. In fact, the increase in violence was more geometric than arithmetic; that is, the number of inmates *convicted* of violent offenses more than tripled from 1983 (77) to 1990 (289) as the average over design capacity rose from 41 percent in 1981 to 60 percent in 1990. *Id.* at 1468 n. 4, 1472–73. (*Compare* Exs. 291–299 *with* Ex. 321.) As documented earlier, it is also undisputed that Clarke and Hopkins received monthly reports showing the increasing number of convictions.

Accordingly, because Clarke and Hopkins were among the decision makers regarding the double-cell policy and were given specific statistical information on a monthly basis showing that convictions for violence rose as double-celling increased, it is obvious they knew of the "positive correlation between the amount of double celling and the increase of violent incidents" at the penitentiary. *Jensen I,* 807 F.Supp. at 1473. It strains credulity for Clarke and Hopkins to argue they were blind to this patently evident reality.

---

12. While Judges Piester and Cambridge found that double-celling had not been shown to be the precise cause of the violence, *Jensen I,* 807 F.Supp. at 1473, they also found there was a positive correlation between the two. *Id.*

Fourth, as Frank Gunter, a defendant in this case, has admitted, it is a "widely accepted principle of prison management" that "a prison cell should not be used for more than one prisoner" because the ability to manage the prison population erodes and the potential for violence increases when prisoners are double-celled. This being true, Clarke and Hopkins knew it was a risky and dangerous business to put two men into a cell built for one man.

In September, 1989, while Clarke was warden and Hopkins deputy warden, Gunter, who was then director of all Nebraska prisons, told the Nebraska legislature's committee on prison overcrowding:

*A widely accepted principle of prison management dictates that a prison cell should not be used for more than one prisoner.* The rationale for this is obvious. People who are in prison have demonstrated a difficulty in obeying societal laws, ... rules and regulations, and in many cases have demonstrated a difficulty in getting along with others. *A significant number of these prisoners either are serving time for a current violent crime or have a history of violent offenses.* If a prison with 100 cells must accommodate 120 prisoners, then 40 of its prisoners, or one-third, will be housed two to a cell. *Prison administrators generally agree that when a prison population exceeds capacity, their ability to manage the inmate population begins to erode.* As the numbers of prisoners increase, the following scenarios develop: .... *This lessening of control increases the probability of inmate problems and potential violence.*

(Ex. 23 Gunter Test. Before the Comm. on Prison Overcrowding of the Neb. Leg. 1, 21–22 (Sept. 22, 1989) (emphasis added).) [13]

In January, 1990, referring to all Nebraska prisons generally and the penitentiary specifically, Gunter told the Nebraska legislature:

The Nebraska State Penitentiary is 145 percent of capacity.... *The overcrowding problem and the impact of that problem is now critical and requires immediate attention....* The department's budget deficit request submitted in November, 1989 addresses how *present prison overcrowding coupled with projected growth has significantly impacted Nebraska's inmate system* in three important ways. *Number one, it has critically reduced the department's ability to operate safe and secure institutions.*

(Ex. 24 Gunter Test. Before the Comm. on Appropriations of the Neb.Leg. 1, 2 (Jan. 25, 1990) (emphasis added).)

Given the level of violence in the penitentiary generally, Clarke and Hopkins were well aware as experienced administrators that prisoners would be subjected to a substantial risk of violence in the double cells. Clarke and Hopkins cannot credibly deny knowledge of this "widely accepted principle of prison management." [14] After all, it was their boss, Frank Gunter, who told the Nebraska legislature about what "[p]rison administrators generally agree" upon. Moreover, it was their boss who told the Nebraska legislature that the Nebraska prison system, including the penitentiary, suffered from a "critical" reduction in the "ability to operate safe and secure institutions."

Fifth, the statements of Clarke and Hopkins establish their actual knowledge of the substantial risk of harm. Although numerous examples could be used, three of Clarke's and Hopkins's statements make the point:

1. Based upon his monthly review of the reports of violence since 1987, Hopkins con-

**13.** Interestingly, Larry Tewes appeared with Gunter before the legislature. According to Gunter, Tewes was then the "assistant director of the classification and correctional programs" for DCS. (*Id.* at 21.) Tewes served Clarke in the same capacity when Clarke became director. As noted earlier, Tewes testified in this case that neither the "classification study" nor the "scoring instrument" was used "in any attempt to try and predict the compatibility of cell mates." (Vol. IX, at 1753:2–6.)

**14.** Although he initially quibbled with Gunter's statement about putting two people in one cell, Clarke agreed with Gunter that "when a prison population exceeds capacity, a prison administrator's ability to manage the inmate population begins to erode." (Vol. VII, at 1239:12–16.) After being pressed further, Clarke finally admitted, "I can tell you that it's management's preference to have one offender per cell." (Vol. VII, at 1242:20–22.)

cluded that misconduct reports had increased "quite a bit." (Vol. XV, at 2836:15–22; 2869:13–2871:15.) Hopkins described his knowledge this way: *"The numbers of misconduct reports have gone up, and my understanding is quite a bit.... I suppose it could be—you could say substantial. I know that we've had a definite increase in misconduct reports that are lodged against inmates."* (Vol. XV, at 2870:15–21 (emphasis added).) These reports were very significant because, according to Clarke, a misconduct report was not written by prison employees "unless there are—unless acts have been committed which the reporter believes constitutes a violation of the code of offenses." (Vol. XVIII, at 3640:20–23.) [15]

2. After becoming director of DCS, Clarke told the Nebraska legislature, referring to the penitentiary specifically and Nebraska prisons generally, that *"predatory behavior is increasing and weaker inmates are forced to seek protective custody, which has increased by 70 percent in less than two years."* (Vol. VII, at 1258:5–10 (emphasis added).) At trial, Clarke stated that the number of inmates seeking protective custody at the penitentiary had at least doubled from 20 to 40 between 1989 and the time of trial in 1991 (a 100–percent increase in two years). (Vol. VIII, at 1390:18–1391:25.) In fact, Clarke testified that *"we have had a waiting list at the penitentiary"* to get into protective custody for *"quite some time."* (Vol. VIII, at 1391:10–11 (emphasis added).)

3. Clarke further testified at trial that *"I believe that, yes, we are seeing signs of dysfunction,"* the *"signs of dysfunction comes in the form of it becoming more difficult to find individuals who are compatible,"* and *"this is all due to overcrowding."* (Vol. VII, at 1250:15–1251:6.) Clarke was *"referring to inmates who are [not] compatible."* (Vol. VII, at 1251:7–11) (emphasis added).) He understood *"compatibility"* to mean the abili-

ty *"to place offenders together who are not going to have conflicts with each other."* (Vol. VII, at 1251:12–17) (emphasis added).) According to Clarke's own admission, he knew that *"[w]e have had a crisis in Nebraska for quite some time and we have been saying so."* (Vol. VII, at 1255:4–5) (emphasis added).)

2.

Clarke and Hopkins assert a variety of arguments in an effort to defeat the finding and conclusion that they actually knew the level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs. I am not persuaded by any of these arguments and will address only those that warrant a response.

First, Clarke and Hopkins have misunderstood the significance of the penitentiary-wide statistics insofar as their knowledge is concerned. They want to ignore the penitentiary-wide statistics on the theory that unless the statistics are limited to the cells, the numbers are meaningless insofar as their knowledge is concerned. Kindly put, this argument is not worthy of belief.

Without ambiguity the statistics showed (and this court repeatedly found) that a pervasive risk of harm to inmates from violence existed *throughout the penitentiary*. Quite apart from the testimony of the inmates that assaults in the cells were routine, it was obvious to anyone that the violence did not somehow magically stop at the cell doors. In fact, the "positive correlation between the amount of double celling and the increase of violent incidents" was plain for all to see. *Jensen I*, 807 F.Supp. at 1473. There is no basis to conclude that Clarke and Hopkins actually believed the cells were a safe haven from violence, given the statistical evidence that conclusively proved a violent assault or threat of assault took place "every other day" *throughout* the penitentiary.

15. Clarke and Hopkins suggest that the increase in misconduct reports was a function of better reporting. While there is little hard evidence to back up this rationalization, the explanation is itself damning even if it is accepted at face value (a proposition that I reject as factually unsupported). If true, Clarke and Hopkins would have actually known that the level of violence in the penitentiary was much higher than the already frightening statistics revealed. Yet notwithstanding their actual knowledge that the violence was even worse than reported, they would have unreasonably continued to double-cell inmates without consideration of classification information.

Second, Clarke and Hopkins have misapplied their own statistics in an effort to show they lacked knowledge that cells are violent places. In essence, they suggest the numbers do not reveal a serious problem in the cells. The manner in which they reach this conclusion is, to say the least, unconvincing.

For example, Clarke and Hopkins purportedly endeavor to examine the statistics regarding assaultive behavior in the cells. They use the conviction data, (Exs. 291–299), for assaults and threats of assault documenting 1,774 convictions during the relevant time frame. They concentrate on 130 incidents involving assaults by inmates upon inmates, but not threats of assault. By thus limiting their inquiry, Hopkins and Clarke maintain they are able to identify 44 incidents where there is a short narrative statement of what happened. These narratives sometimes, but not always, identify a general location.

Using the 44 incidents where there are narratives, Clarke and Hopkins suggest that only 5 of the assaults took place in the cells, although they admit they do not know where 10 of the 44 assaults took place. (Defs.' Br. at 10–12 & App. A at 72.) Clarke and Hopkins thus argue that they had no reason to believe the cells were dangerous places.

However, even a cursory examination of the methodology employed by the defendants makes clear that their statistical sleight of hand proves nothing which helps them. Four illustrations make the point:

1. Clarke and Hopkins ignore 86 of 130 incidents because they have no narrative statements describing the event, and thus no specified location. *They simply assume without explanation or justification that none of those 86 incidents took place in the cells.*

2. *The "assaults" selected by Clarke and Hopkins ignore other actual "assaults."* For more than 5 years of the survey's time frame, "assaults" were defined by Clarke and Hopkins as "assaults" *only if* "bodily injury" could be shown to have occurred. (Defs.' Br., App. A at 72 "Note".) Thus, the type of beating inmate Jensen suffered at the hands of Svitak would not be reported as an "assault" because there was no corroborating evidence of "bodily injury." Similarly, rape of the kind perpetrated upon Hart's cellmates (only "four out of seventeen [cellmates was I] unable to encourage or coerce into a homosexual act") would not be counted as "assaults."

3. Clarke and Hopkins disregard *convictions* for "threats of assault" as if they were meaningless. Given that many "threats of assault" are actually "assaults," this exclusion is particularly unwarranted. More to the point, excluding "threats of assault" is especially troubling because it shows a complete misunderstanding of the Eighth Amendment. This misunderstanding is even more significant because the "threatened assaults" ignored by Clarke and Hopkins resulted in *convictions.*

As the Supreme Court said in *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 2480–81, 125 L.Ed.2d 22 (1993), "[t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition. *The Amendment ... requires that inmates be furnished with basic human needs, one of which is 'reasonable safety.'"* (Citation omitted.) (Emphasis added.) *Farmer v. Brennan* echoed this point: *"[A] subjective approach to deliberate indifference does not require* a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] *actua[l] assaul[t] before obtaining relief.'"* *Farmer*, —— U.S. at ——, 114 S.Ct. at 1983 (citing *Helling*, 509 U.S. at 33, 113 S.Ct. at 2481) (emphasis added).

Simply put, the *Farmer* "subjective approach to deliberate indifference" does not permit prison administrators to ignore threats of assault. *Id.* However, that is precisely what Clarke and Hopkins have done in the past, and continue to do in their brief on remand.

4. *The numbers generated by Clarke and Hopkins regarding Exhibits 291–299 do not help them.*

(a) *Their numbers* (5 out of 44) *establish that more than 11 percent of "assaults" took place in the cells.*

(b) Since Clarke and Hopkins admit they do not know where 10 of the 44 assaults occurred, (Defs.' Br. at 12), it is necessary to exclude those 10 incidents from consideration (just as the defendants

excluded 86 others when they made their "first cut") because these incidents may or may not have occurred in the cells. *After excluding the 10 incidents for which no location was pinpointed, nearly 15 percent of the "assaults" (5 out of 34) occurred in the cells.*

(c) Still further, *when assaults in the housing units (other than in the cells) (8) are included with assaults in the cells (5)* because violence in the housing units is obviously closely linked to violence in the cells, *the incidence of violence in or near the cells (13 out of 34) increases to about 38 percent.*

A similar critique of the defendants' analysis of other exhibits could also be made. (*See* Defs.' Br. at 6–9, discussing Exs. 27, 32–34, 36, 39, 75–77, 81, 84–92, 103.) However, for the sake of brevity, I shall not repeat the entire critique with regard to these exhibits since one example will suffice. When violence in the housing units is compared with violence outside the housing units by using Exhibits 27, 32–34, 36, 39, 75–77, 81, 84–92, and 103, *the defendants' own analysis shows that more than 46 percent of the time (41 of 89 incidents), the violence takes place either in or near the cells.*[16]

Third, the defendants argue there is very little evidence to show that the violence involved "newly arrived" inmates as opposed to "veterans"; thus, there is no evidence to suggest that Clarke and Hopkins were aware of the risk to newly arrived inmates. This argument is completely without merit.

Initially, I find no evidence to suggest there was an effort to keep track of how many times a newly arrived inmate was assaulted (or perpetrated an assault) compared to "veteran" inmates. Therefore, Clarke and Hopkins had no reason to think *their* statistics differentiated between "newly arrived" and other inmates.

More importantly, Clarke and Hopkins had no reason to think that "newly arrived" in-

mates were somehow magically immune from the violence that permeated the penitentiary, just as they had no reason to think the violence somehow magically ceased at the cell doors.

Still further, the issue in this case does not involve only newly arrived inmates, as the defendants implicitly suggest. The evidence regarding the celling of newly arrived inmate Hart graphically punctuates this point.

### 3.

In summary, it would be preposterous to suggest that Clarke and Hopkins could know both that a substantial risk of harm due to violence existed in the housing units and that about 75 percent of the inmates were double-celled, while also suggesting that Clarke and Hopkins did not actually know of the substantial risk of serious harm from violence to those inmates in the double cells. Yet that is precisely what the defendants' argument, stripped of its legal verbiage, would mean if adopted by this court. I refuse to be a party to such sophistry.

## F. THE FAILURE TO USE CLASSIFICATION INFORMATION AND THE CONCOMITANT FAILURE TO DETERMINE INMATE COMPATIBILITY WAS AN UNREASONABLE RESPONSE TO A SUBSTANTIAL RISK OF SERIOUS HARM TO THE PLAINTIFFS.

■ Clarke and Hopkins have both an initial and a "fall-back" answer to the question of whether their failure to use classification information and the concomitant failure to determine inmate compatibility was an unreasonable response to the substantial risk of serious harm. I shall consider each argument separately.

### 1.

Interestingly, Clarke and Hopkins do not directly argue that it was a reasonable re-

---

**16.** The defendants admit these exhibits alone show that 41 incidents of violence took place in the housing units, and 7 of those incidents were clearly identified as involving the cells. (*Compare* Defs.' Br. at 7 (discussing 5 times when inmate reported threat of assault and requested a cell move) *with* Defs.' Br. at 9 (discussing location of 36 reports of violence in the housing units

but excluding 5 incidents shown on page 7 of brief).) These 41 incidents may then be compared with the 48 incidents the defendants contend took place somewhere outside the housing units. (Defs.' Br. at 8 (discussing the 48 incidents the defendants contend took place outside the housing units).)

sponse to the substantial risk of harm to fail to use classification information for the purpose of determining inmate compatibility insofar as "newly arrived" inmates were concerned. As previously noted, (pt. I.B.2.(a) & (b)), Clarke and Hopkins argue that the unit managers actually made considered decisions on inmate compatibility before cell assignments were made, and that the "initial classification" meeting actually considered the issue before cell assignments were made and while its chairperson was in possession of the "scoring instrument." As noted earlier, I reject these arguments as factually unsupported.

The question then becomes whether the failure to consider this information before making cell assignments for newly arrived inmates is an unreasonable response to the known substantial risk of violence. *Farmer,* ___ U.S. at ___, 114 S.Ct. at 1982–83 ("In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Keeping in mind that a "prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" not guarantee absolute safety, *Farmer,* ___ U.S. at ___, 114 S.Ct. at 1983 (citation omitted), I find and conclude that the consistent and systematic failure to consider classification information in an effort to determine inmate compatibility regarding "newly arrived" inmates was unreasonable under the Eighth Amendment. Such a failure amounts to playing "Russian roulette" with both new inmates (like Jensen) and "veteran" inmates (like Hart's victims) for no legitimate purpose.

The only reason not to consider classification information is the highly culpable intent to continuing stuffing the penitentiary with some 500 newly arrived inmates a year without the bother of safety considerations that

conflict with the goal of "put[ting] the incoming inmate essentially where you've got space." (Vol. VII, at 1202:22–25.) This is precisely the sort of "blind eye" that the Eighth Amendment does not tolerate. *Farmer,* ___ U.S. at ___ n. 8, 114 S.Ct. at 1982 n. 8 (A "prison official" would not "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.").

In sum, as Judges Piester and Cambridge previously observed, the decision to ignore classification information was "not a negligent oversight, but a deliberate choice of alternatives made under the circumstances of pervasive risk of harm." *Jensen I,* 807 F.Supp. at 1483–84. Space, not safety, was the choice Clarke and Hopkins deliberately made. Such a choice was unreasonable under the Eighth Amendment. I appreciate the political pressures that both Clarke and Hopkins labor under to cram more and more inmates into the penitentiary despite the obvious limitations of that institution. However, it is no defense to suggest, as Clarke and Hopkins implicitly do, that "I violated the Eighth Amendment because the legislature made me do it." (Vol. VII, at 1249:1–25.) [17]

### 2.

Although it is not articulated as such, Clarke and Hopkins appear to assert a fallback position that can be characterized this way: If the court finds that no effort was made to use the classification information to determine inmate compatibility regarding newly arrived inmates, other steps, such as cell moves, protective custody, and staff on the gallery render this decision otherwise reasonable. I am totally unconvinced.

Once a newly arrived inmate is placed in a cell with another inmate without consideration of issues of compatibility and the two are "locked down" together for 10 to 14 hours a day, no subsequent effort is likely to

---

17. During this exchange, Clarke was asked about his admission to the Nebraska legislature that overcrowding in the penitentiary was critical. In essence, Clarke testified at trial that he could not do anything even though he was the director of DCS. According to Clarke, it was up to the legislature to appropriate "resources that are necessary to make change" because he could not

"build without permission." While Clarke obviously could not "build without permission," such a straw-man argument is a diversion from the real issue. This court did not require Clarke to "build without permission." Rather, the court held that Clarke and Hopkins could not stuff the prison with new inmates without considering the safety of the inmates who are double-celled.

be as effective as the simple expedient of making a sensible decision in the first place.

In this regard, *the defendants' evidence established that inmate compatibility is "easily" predicted for purposes of making cell assignments. Jensen I*, 807 F.Supp. at 1477 (Vol. XIV, at 2788:23–2789:19 (Gunter)); (Vol. XVI, at 3086:19–3087:1–3 (Defense Expert)). In fact, when asked whether "compatibility of cellmates is something that's easy to predict," the defendants' expert answered, "One can usually do very well predicting compatibility of cellmates." (Vol. XVI, at 3086:19–3087:3.) It is especially easy for penitentiary employees to predict cellmate compatibility because the "classification study" and the "scoring instrument" have been prepared before the inmate arrives.

Moreover, such measures as protective custody, cell moves, or a guard walking through the gallery every so often require *at the very least* that an inmate suffer the mind-numbing terror of a threatened rape or beating *before* he is moved, placed in protective custody, or rescued by a guard. The Hart incidents, where only 4 out of 17 of Hart's cellmates escaped sexual assault, (Vol. V, at 853:12–19), and 5 of his cellmates were forced to seek protective custody, (Vol. VI, at 894:11–895:16); the Jensen incident, where Jensen was beaten after first requesting a cell move, (Vol. IV, at 604:15–605:14; 606:9–20; 607:7–17); and the Harpster incident, where his face was repeatedly smashed into a table in the cell without detection by a guard until after the fight, (Vol VI, at 1060:15–1074:18), are all stark indicators of this reality.

Simply put, the risk of ignoring inmate compatibility is very high, while the cost and difficulty of determining inmate compatibility are quite low.

## G. CLARKE AND HOPKINS WERE PERSONALLY RESPONSIBLE FOR THE FAILURE TO USE CLASSIFICATION INFORMATION AND THE CONCOMITANT FAILURE TO DETERMINE INMATE COMPATIBILITY DURING THE PLACEMENT OF NEWLY ARRIVED INMATES INTO DOUBLE CELLS.

Clarke and Hopkins cannot be found liable for the Eighth Amendment violation unless they may fairly be held responsible for the failure to use classification information and the concomitant failure to determine inmate compatibility. *See, e.g., Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir.1993). It is not enough that they have long held and continue to hold senior management positions with regard to the penitentiary.

■ However, senior prison administrators like Clarke and Hopkins "can incur liability for cruel and unusual punishment in two ways." *Id*. First, "they can 'be liable for their personal involvement in a constitutional violation.'" *Id*. (quoting *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir.1990)). Second, they can be liable "'when their corrective inaction amounts to "deliberate indifference" to or "tacit authorization" of the violative practices.'" *Id*. (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.1989), in turn quoting *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir.1988)). Indeed, prison officials who act or fail to act like Clarke and Hopkins are routinely held personally responsible for a violation of the Eighth Amendment. *See, e.g., Walsh v. Mellas*, 837 F.2d 789, 795–99 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988) (affirming award of punitive damages against prison officials for violating the Eighth Amendment when the officials did not review inmate files to determine the compatibility of cellmates in an "investigative status" area of the penitentiary). The United States Court of Appeals for the Seventh Circuit held in *Walsh* that the officials violated the Eighth Amendment because they approved a cell-assignment method that failed to use a "good faith screening procedure similar to the one utilized for the general population, involving a review of the inmate's files before assigning him a cell...." *Id*. at 797.

■ The evidence establishes both that Clarke and Hopkins were personally involved in the constitutional violation and also that their inaction amounted to authorization of the violative practices. Everything I heretofore found supports this conclusion, but I

shall briefly restate two bits of evidence that illustrate the point:

1. The decision to put two men into a cell designed for only one was made with the input, and frequently the direct and conscious approval, of both Clarke, (Vol. VIII, at 1423:8–13; 1424:16–18), and Hopkins (Prelim. Inj.Hr'g Tr. at 55:7–11; Vol. XV, at 2840:24–2842:4; 2896:13–20).

2. Clarke personally signed, and both men followed, the written prison regulation setting forth the goals of the "initial classification" meeting that failed to require consideration of the "classification study" and "scoring instrument" for purposes of determining cell assignments. (Ex. 251; Vol. VII, at 1144:16–1146:1.)

## II. CERTIFICATION

I certify to the United States Court of Appeals for the Eighth Circuit that I have found as fact and concluded as law that Clarke and Hopkins "actually knew of and disregarded [the] substantial risk [from violence] to the safety of the plaintiffs," *Jensen IV*, 73 F.3d at 811, by "failing to use the classification information available to them in placing newly arriving inmates in double cells." *Jensen I*, 807 F.Supp. at 1483.

I arrived at this finding and conclusion for the following seven reasons:

1. Most inmates are double-celled.

2. Newly arrived inmates are randomly double-celled; that is, newly arrived inmates are assigned cells without consideration of classification information that could easily be used to predict inmate compatibility.

3. Clarke and Hopkins actually knew that newly arrived inmates were frequently randomly double-celled.

4. The level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs.

5. Clarke and Hopkins actually knew the level of violence at the penitentiary, including violence in the double cells, posed a substantial risk of serious harm to the plaintiffs.

6. The failure to use classification information and the concomitant failure to determine inmate compatibility was an unreasonable response to the substantial risk of serious harm to the plaintiffs.

7. Clarke and Hopkins are personally responsible for the failure to use classification information and the concomitant failure to determine inmate compatibility during the placement of newly arrived inmates into double cells.

Accordingly,

IT IS ORDERED that the Clerk of the United States District Court for the District of Nebraska shall promptly serve the Clerk of the United States Court of Appeals for the Eighth Circuit with a copy of this memorandum and order for delivery to the panel of judges who are considering the appeal of this matter.